**In re LIVING HOPE SOUTHEAST, LLC, Debtor-in-possession.**

**No. 4:12–bk–11082 E.**

United States Bankruptcy Court, E.D. Arkansas, Little Rock Division.

Oct. 4, 2012.

James H. Akins, Jr., James E. Smith, Jr., Smith Akins, Little Rock, AR, Jeannette A. Robertson, Robertson Law Firm, Jonesboro, AR, Morgan E. Welch, Eubanks, Welch, Baker & Schulze, Little Rock, AR, for Debtor.

Michael E. Collins, Manier & Herod, Nashville, TN, Trustee.

Robert W. Miller, Fred C. Statum, III, Justin Damon Wear, Manier & Herod, Nashville, TN, for Trustee.

## *ORDER APPROVING APPLICATION TO EMPLOY ATTORNEY*

AUDREY R. EVANS, Bankruptcy Judge.

Now before the Court is the *Application to Employ Attorney* (the **"Application"**) filed by the Debtor-in-possession seeking to hire the law firm of Smith Akins, P.A. and the firm of Welch, Brewer and Hudson, LLC as counsel for the Debtor in this bankruptcy proceeding. This application was filed June 13, 2012, and creditor Pinewood Enterprises, LC (**"Pinewood"**) filed an objection on June 19, 2012. The Court held a hearing on this matter July 26–27, 2012. The Debtor appeared through James E. "Jim" Smith, Morgan "Chip" Welch and Ashley Welch Hudson. Judy Henry and Diana Synder appeared on behalf of Pinewood. Following testimony and the submission of documentary evidence, the Court took the matter under advisement. On August 6, 2012, the Court entered its *Order Approving in Part Application to Employ Attorney* resolving most of the issues raised by Pinewood's objection, and hiring Chip Welch and Ashley Hudson to represent the Debtor, but reserving the issue of whether Jim Smith held an adverse interest to the estate based on certain transfers and distributions made by the Debtor to or on behalf of its owner, the AK Trust, or its beneficiaries, Kimbro and Alice Stephens. After reviewing the record in this case and the applicable case law, the Court finds that Jim Smith is disinterested and neither holds nor represents an adverse interest to the Debtor's estate as required by 11 U.S.C. § 327(a), and accordingly, Smith and his firm are hired to represent this estate.

## BRIEF FACTUAL BACKGROUND

The Debtor, Living Hope Southeast, LLC (**"Living Hope Southeast"** or **"LHSE"**), operates an outpatient facility in Little Rock. The Debtor, certain related entities, trusts, and individuals share a long and litigious history with creditor Pinewood and the Chapter 7 Trustee of a related entity in bankruptcy, Living Hope Southwest Medical Services, LLC (**"Living Hope Southwest"** or **"LHSW"**). Without delving into all the details of the long history of this litigation (as there is much information not in the record before

this Court),[1] the litigation involving these parties began approximately six years ago when LHSW breached a lease agreement with Pinewood; Pinewood sued LHSW and other parties in the Miller County Circuit Court (the **"Miller County Case"**); and LHSW filed bankruptcy under Chapter 11.

In 2008, LHSW's case converted to Chapter 7, and Renee Williams was appointed Trustee (the **"LHSW Trustee"**). The LHSW Trustee brought multiple adversary proceedings against multiple parties, one of whom was LHSE. The LHSW Trustee ultimately settled five of these adversary proceedings, and the Honorable James G. Mixon approved the settlement over Pinewood's objection following a hearing held November 17, 2009 (the **"LHSW Settlement"**). *See Order Approving Settlement, In re Living Hope Southwest,* No. 4:06–bk–71484 (November 20, 2009) (docket # 479).

The Settlement Agreement, signed May 27, 2009, documented the settlement reached between the LHSW Trustee and the defendants in five adversary proceedings brought by the Trustee, including a lawsuit against each of the Stephenses (4:09–ap–7019 and 4:09–ap–7025) and a lawsuit against LHSE (4:09–ap–7023). The agreement provided for a consent judgment to be entered against Alice and Kimbro Stephens in the amount of $1,150,000, on conditions, with at least $750,000 to be paid by December 31, 2011. To secure payment of the consent judgment, LHSE agreed to allow the LHSW Trustee an inchoate judgment lien on all

the memberships interests of LHSE (which are indirectly owned by the Stephenses) and on all income derived from the operations of LHSE. The Settlement Agreement further provided that upon the Stephens's default, the inchoate judgment lien would "immediately and automatically ripen into a fully vested and perfected lien on all LHSE membership rights, and on all of its assets and income to the extent such is required to satisfy the balance due on the Consent Judgment."

On behalf of LHSE, Smith established an account at Metropolitan National Bank named the "LHSE, LLC, Escrow Account." Smith testified that he and the LHSW Trustee had a verbal agreement to hold the funds in the account with Smith acting as escrow agent in order to hold the settlement payments until a final order was entered approving the settlement. He testified that the account was opened on March 16, 2009, when there was a settlement agreement in place with the LHSW Trustee; the settlement agreement was then executed on May 27, 2009, and subsequently approved by the Bankruptcy Court. (Regardless of whether this account was a formal escrow account, the Court finds it served the purpose of holding funds in escrow as that term is commonly understood.) LHSE has paid a total of $250,000 to the account towards the settlement, with the most recent payment of $50,000 paid in December 2011; $53,500 paid between October 2009 and February 2010; and $146,500 paid as of October 2009. (Pinewood Exhibit # 11). Payments were made from the escrow account to the LHSW Trustee as follows: $50,000

---

**1.** On January 11, 2012, U.S. District Court Judge P.K. Holmes, III entered a Memorandum Opinion and Order in an appeal of a decision in the Living Hope Southwest bankruptcy (4:06–bk–71484) which has been ongoing in the Texarkana division of the Bankruptcy Court since 2006. In that Memorandum Opinion, which is available on Westlaw at 2012 WL 79661, Judge Holmes described the history of the parties and proceedings.

on December 31, 2011; $53,000 on June 20, 2011, and $146,500 on November 30, 2009. (Pinewood Exhibit # 12). Accordingly, the LHSW Trustee has received $249,500, and $500 remains in the escrow account.[2] Smith testified that he believed the Debtor had to make payments on the LHSW Settlement (even while it was on appeal as described below) in order to keep LSHE's Medicaid/Medicare provider number and continue its business of providing medical services.

Judge Mixon's approval of the settlement was appealed to the District Court for the Western District of Arkansas, and the Honorable Jimm Larry Hendren reversed Judge's Mixon's *Order Approving Settlement* finding that the settlement encompassed alter ego/veil piercing claims personal to LHSW's creditors which the Trustee did not have standing to bring. *See* Copy of *Order, In re Living Hope Southwest*, No. 4:06–bk–71484 (March 18, 2011) (docket # 584). On remand, Judge Mixon held additional hearings and approved the settlement again but carved out the alter ego/veil piercing claims. *See Supplemental Order Approving Settlement, In re Living Hope Southwest*, No. 4:06–bk–71484 (May 27, 2011) (docket # 609) and *Amended Supplemental Order Approving Settlement, In re Living Hope Southwest*, No. 4:06–bk–71484 (August 24, 2011) (docket # 632). Judge Mixon also entered an injunction in June 2011 prohibiting Pinewood from pursuing LHSE and another individual in the Miller County Case finding that it was pursuing the LHSW Trustee's settled causes of action, and that while Pinewood could pursue its alter ego/veil piercing theories against LHSE and other individuals in State Court, it could not pursue those causes of actions the LHSW Trustee had previously settled.[3] Pinewood appealed both the June 2011 injunction and Judge Mixon's approval of the settlement to the Western District Court and also filed a motion for a stay pending appeal to stay the injunction entered by Judge Mixon. On January 12, 2012, the Honorable P.K. Holmes, III granted Pinewood's motion for a stay in order to permit Pinewood to proceed against LHSE and Mike Grundy (LHSE's manager) in the Miller County Case but not to collect until the District Court decided on the merits whether the Bankruptcy Court's order granting the injunction should be reversed. In that order, Judge Holmes also consolidated the two appeals pending before him.

While the LHSW Settlement proceeded through the appeals process, Miller County Circuit Judge Kirk Johnson entered several preliminary injunction/restraining orders which enjoined the defendants (including the Debtor, the Stephenses and various related trusts and partnerships) from transferring "any assets, except in the ordinary course of the individuals' and entities' business pending trial." (Pinewood Exhibits 2–4: Orders entered by Judge Johnson on May 7, 2010, May 20, 2010 and June 4, 2010).[4] On September

---

2. Believing that the LHSW Trustee had received the entire $250,000 and the escrow account had been closed, LHSE's counsel failed to list the $500 remaining in the escrow account on LHSE's schedules. LHSE may file amended schedules to correct this inadvertent omission.

3. Judge Mixon had previously denied the Trustee's request for an injunction in April 2010.

4. In the June 4, 2010 order, Judge Johnson found that Pinewood was likely to succeed on the merits of its complaint because it had shown that:

15, 2011, Judge Johnson entered another preliminary injunction/restraining order which also allowed certain counsel to withdraw from the proceedings before him. (See Pinewood Exhibit 15.) It is not clear to what extent Judge Mixon's June 2011 injunction halted or delayed the Miller County Case. Smith testified that LHSE filed its bankruptcy petition under Chapter 11 on February 27, 2012, because an order had been entered in the Miller County Case that would have "killed off" LHSE. (The Court does not have a copy of any Miller County orders other than those previously listed.) A few months after filing bankruptcy, LHSE removed the Miller County Case to the District Court for the Western District of Arkansas, and the case was assigned to the Honorable Susan O. Hickey. It is this Court's understanding that Pinewood then moved to remand the case back to Miller County Circuit Court, and Judge Hickey has not yet ruled on the remand motion.

In sum, while LHSE continues its business under protection of the Bankruptcy Code, the validity of the settlement reached between the LHSW Trustee, LHSE and other defendants is pending before Judge Holmes in the Western District, and a motion to remand Pinewood's Miller County Case against LHSE and other defendants is pending before Judge Hickey. The Court also notes that David Kimbro Stephens filed bankruptcy under Chapter 7 on November 30, 2010, the Honorable Richard D. Taylor presiding (No. 6:10–bk–76216), and that case remains open.

## DISCUSSION

In the course of at least six years of litigation, the dispute between Pinewood and the various entities owned by the Stephenses have come before three bankruptcy judges, at least one state court judge, and at least three district court judges. The extent of this litigation has created enormous complexity. In reliance on this complexity, Pinewood uses a routine application to hire counsel as yet another opportunity to pierce the corporate veil of LHSE, which is the cause of action currently pending before Judge Hickey and awaiting a decision on remand. To what extent Pinewood gets to pursue its veil piercing action is also the subject of the appeals before Judge Holmes. Regardless of whether the veil of LHSE should be pierced for the benefit of Pinewood (or whether whatever wrongs the Stephenses committed in creating LHSE were righted by the settlement with the LHSW Trustee), the Debtor and its owners—the Stephens—share a common interest at the heart of this bankruptcy: continuing to operate a business providing medical services despite protracted litigation with Pinewood. The only way for LHSE to keep operating is to keep its provider number, and according to Smith, paying the LHSW Trustee on the settlement allowed LHSE to do so. While Pinewood argues these prepetition payments and

monies and property have been conveyed from one entity to another without any justifiable business reasons as they pertain to those businesses. The Plaintiff has sufficiently shown through the exhibits that these businesses are managed as if they were the personal fiefdom of the Defendants, Kimbro and Alice Stephens, rather than separate and distinct legal entities.

The Court is further convinced that the Plaintiff has a reasonable probability of success on proving that the transfer of these assets by Defendants, Kimbro and Alice Stephens, is for the fraudulent intent to cheat, hinder and delay the creditor and that Defendants are actively seeking to sell assets at the time of this hearing which would cause irreparable harm to the Plaintiff.

others harmed the Debtor and are cause to disqualify Smith, the Court finds that the Debtor had valid reasons for making the prepetition payments at issue here and Smith's advice regarding those transfers does not create a conflict of interest for Smith and his firm, as explained below.

### Legal Standard and Issue Presented

■ As the Court explained in its August 6, 2012 Order, the Court may approve a debtor-in-possession's employment of counsel to represent it in carrying out its duties under the Bankruptcy Code pursuant to § 327(a). "Under § 327(a), there are essentially two conditions for an attorney's employment: the attorney must be 'disinterested,' and the attorney cannot hold or represent an interest adverse to the estate." *In re M & M Marketing, L.L.C.,* 426 B.R. 796, 802 (8th Cir. BAP 2010). The Court previously found that none of the applicants, as individuals, held an adverse interest to the Debtor, and that none of the applicants had an identifiable conflict by representing any other creditors, insiders or parties-in-interest. The issue raised by Pinewood is whether the applicants, and specifically Jim Smith, who has represented the Debtor for approximately four years prepetition, actually represent insiders who may have an adverse interest to the Debtor. These insiders are allegedly the AK Trust (which owns 99% of the Debtor's membership interests) and Alice and Kimbro Stephens who are beneficiaries of the AK Trust and who are liable to Renee Williams, Chapter 7 Trustee, for the LHSW Settlement.[5] In its

August 6, 2012 Order, the Court stated that regular monthly distributions from the Debtor to its 99% owner, the AK Trust, as well as the payments made on the LHSW Settlement were questionable and raised *potential* conflicts of interest. The Court was not prepared then to hold that Smith actually represented any insiders, or that his representation of LHSE in those transactions created an *actual* conflict of interest. *See, e.g., In re Marvel Entertainment Group, Inc.,* 140 F.3d 463, 476–477 (3rd Cir.1998) (regarding actual versus potential conflicts of interest and disqualification of counsel). The Court has since studied the record in this case and the applicable law and finds that Smith does not actually represent those insiders, and that his prepetition representation of the Debtor while certain transactions took place does not create an actual conflict of interest between Smith and the Debtor.

### No Actual Representation of Insiders

■ The Court previously found that Smith did not personally have any conflicts with the Debtor. *In re Living Hope Southeast, LLC,* No. 4:12–bk–11082, at 4, 2012 WL 8670117 (August 6, 2012) ("In this case, there is no allegation that any of the applicants, as individuals, hold an adverse interest to the Debtor. Further, none of the applicants have an identifiable conflict; they do not represent any other creditors, insiders or parties-in-interest."). "[A]n attorney is not disinterested because he represents an entity that is not disinterested. Whether an attorney (or law firm)

---

**5.** The Debtor's members are: the Kimbro Stephens Insurance Trust who owns a 1% membership interest; the A.K. Tennessee Irrevocable Trust which owns up to a 99% membership interest; and the A.K. Tennessee Irrevocable Residuary Trust which *may* own some membership interest (hereinafter both trusts will collectively be referred to as the "**A.K. Trust**"). Robert Williams is the Trustee of both the A.K. Trusts, and holds voting control of 99% of the Debtor. The beneficiaries of the A.K. Trusts are Kimbro Stephens and Alice Stephens.

is disinterested is solely a function of the *attorney's* relationship to the debtor." *In re M & M Marketing, L.L.C.*, 426 B.R. at 802. Accordingly, Smith is disinterested as defined in 11 U.S.C. § 101(14).

■ However, the second requirement of § 327(a) is that the attorney not hold *or represent* an interest adverse to the estate; this requirement imputes a client's conflict with an estate to the attorney.

> To "hold an interest adverse to the estate" means: "(1) to possess or assert any economic interest that would tend to lessen the value of the bankruptcy estate or that would create either an actual or potential dispute in which the estate is a rival claimant; or (2) to possess a predisposition under circumstances that render such a bias against the estate." **To *"represent*** **an adverse interest" means to serve as agent or attorney for any individual or entity holding such an adverse interest.**

*In re M & M Marketing, L.L.C.*, 426 B.R. at 802–803 (emphasis added in bold). Accordingly, the Court must determine whether Smith actually represents insiders such as the AK Trust, Kimbro Stephens or Alice Stephens (who *may* but do not necessarily hold adverse interests to the Debtor).

■ Smith testified that he began representing LHSE after Renee Williams, the LHSW Trustee, filed a complaint against LHSE in the Living Hope Southwest bankruptcy, approximately four years ago in 2008. (Transcript, p. 40, lines: 16–21). Smith testified that he also represents LHSE in connection with the Miller County Case. (Transcript, p. 46, lines: 15–17). Specifically, Smith stated:

> ... neither applicant firm has represented anyone in connection with this

case other than Living Hope Southeast. And, to the best of my knowledge—I know we have never represented any of the other parties in any connection—and nor, to the best of my knowledge, I think [Welch] may have represented one—one or more members of the Stephens family in unrelated matters decades ago.

(Transcript, p. 32: lines 15–22).

Smith testified he was hired by Mike Grundy, LHSE's manager and his initial contact, but said that he has sometimes met with Kimbro Stephens, and assumed that his representation of LHSE was approved by Kimbro Stephens and Alice Stephens, as beneficiaries of the AK Trust, as well as Robert Williams, as the Trustee of the AK Trust. (Transcript, p. 58, lines: 7–25). On direct examination by Debtor's other attorney, Chip Welch, Smith testified that he went to great lengths to make sure that all parties, including the Stephenses, knew who Smith and Welch represented. He said:

> At that time, Mr. Dowden was representing Mr. Stephens. Ms.—Mr. Keech was, I believe, still representing Ms. Stephens—no, Errol Friedman was representing Ms. Stephens. We went to great lengths to make sure that everybody understood you were—you were representing Southeast. I actually went through my somewhat melodramatic drill I do in these circumstances, and asked everybody in the room to point to Southeast's lawyers. They pointed to us. I do that because there's multiple entities in Arkansas, that sometimes becomes an issue and I want everybody to remember it. I'm not their friend once we file.

(Transcript, p. 38, lines: 3–16).

Based on this uncontroverted testimony, and having previously rejected Pinewood's

other arguments to show Smith actually represented insiders of the Debtor,[6] the Court finds that Smith did not actually represent any other parties besides the Debtor, and consequently, even if these other parties held an adverse interest to the Debtor, such an adverse interest is not imputed to Smith.[7]

### No Actual Conflict of Interest Based on Smith's Representation of LHSE Prior to Bankruptcy

■ Pinewood also argues that Smith should be disqualified because he represented LHSE prior to its bankruptcy filing while it made regular distributions to its members and made payments on the LHSW Settlement, and that he in fact directed LHSE to make these transfers. It is this personal involvement in LHSE's prepetition conduct that Pinewood argues creates a conflict for Smith. Smith's representation of LHSE prior to its bankruptcy alone would clearly not disqualify him as counsel. Section 1107(b) states, "Notwithstanding section 327(a) of this title, a person is not disqualified for employment under section 327 of this title by a debtor-in-possession solely because of such person's employment by or representation of the debtor before the commencement of the case."[8] Accordingly, the Court must examine whether Smith's personal involvement in these transactions creates an actual conflict of interest between him and the Debtor.

With respect to member distributions, Smith explained that distributions to the AK Trust were regularly made for the benefit of Richard Cox, the Trustee in Kimbro Stephens's bankruptcy and that such distributions ceased once the petition was filed. These distributions were disclosed on the Debtor's Statement of Financial Affairs which listed monthly payments of $8,500 to the AK Trust for the past year. Grundy testified that he made the distributions to the AK Trust upon request and on the advice of LHSE counsel, Smith. The Court has insufficient information regarding the Kimbro Stephens bankruptcy

---

6. *See In re Living Hope Southeast*, No. 4:12–bk–11082, at 5 n. 6.

7. While some courts take a strict approach never allowing an attorney to represent both the debtor and its insiders, other courts take a more flexible approach. *See generally* 9 Norton Bankr. L. & Prac. 3d § 172.8 (July 2012) (and cases cited therein). Additionally, some courts approve the hiring of attorneys who represent both the Debtor and its shareholders or other insiders where there is no conflict between the Debtor and such insiders; where there is a conflict between the two, the attorney representing both is disqualified. *Id.* However, in those cases, there is no question that the attorney actually represented the related parties; in this case, there is no evidence that Smith in fact represents the related parties that might have conflicts of interest with the Debtor.

8. Section 1107(b) is usually analyzed in the context of whether professionals with a pre-petition claim against the estate for prepetition services rendered to the Debtor have a disqualifying conflict under § 327. *See generally In re Talsma*, 436 B.R. 908, 915 –916 (Bankr.N.D.Tex.2010) and *In re SBMC Healthcare, LLC*, 473 B.R. 871, 878 (Bankr. S.D.Tex.2012) (holding that a prepetition claim does not alone disqualify professional from representing Chapter 11 debtor-in-possession). Although the issue of Smith's payment for prepetition work was raised in this proceeding, Smith's status as a potential prepetition creditor does not appear to the be basis of Pinewood's objection to Smith's hiring. Rather, Pinewood argued that Smith did not properly disclose prepetition payments in that a $50,000 payment was listed on the statement of financial affairs as a payment made to Smith's firm within 90 days of filing, while his application disclosed that the Debtor paid Smith's firm a $25,000 retainer for bankruptcy work. Smith explained that his firm received a total of $50,000: $5,000 for work done prepetition and a $25,000 retainer.

to understand exactly why those distributions were required but accepts that in Smith's opinion, as LHSE counsel, such distributions were appropriate. The Court's reliance on Smith's judgment is justified by his professional experience, his personal experience representing LHSE both before and during this bankruptcy, and his general reputation as an ethical and ardent debtor's counsel. Accordingly, the Court finds these distributions do not create an actual conflict of interest for Smith. Further, any question as to whether those distributions were in violation of the Miller County injunction is a matter properly decided in a contempt action in the Miller County Case wherever it is ultimately decided (by Judge Johnson in Miller County or by Judge Hickey in the Western District).[9]

Pinewood's counsel also raised questions about LHSE's payments of other Miller County defendants' attorney fees. Grundy confirmed that such payments were made, and Smith explained that based on having appeared before Judge Johnson, he understood some payments were excepted from the injunction as payments made in the ordinary course of Debtor's business, and that exception included making payments for attorneys fees under an indemnification agreement LHSE had with other defendants in the Miller County Case. He stated that at that the initial restraining order hearing in Miller County, he explained the need for such an exception:

> The only [hearing] I was at was, I believe, the first one, and [the Judge] was, when—on request, enjoining transfers, and I explained we couldn't operate without transfers, and he said, well, what do you need? We told him the ordinary course of business and I defined the ordinary course of business to

**9.** Grundy testified that LHSE had not investigated any causes of action it might have based on prepetition transfers made by LHSE. To the extent a preference or fraudulent transfer action is appropriate in this bankruptcy to recover any of the transfers complained of, the Court notes that in extraordinary circumstances a creditor may seek leave of Court to bring an avoidance action if the debtor is unjustified in refusing to do so. *See e.g., In re Racing Services, Inc.,* 540 F.3d 892, 898 (8th Cir.2008) (holding that "[D]erivative standing is available to a creditor to pursue avoidance actions when it shows that a Chapter 7 trustee (or debtor-in-possession in the case of Chapter 11) is 'unable or unwilling' to do so.") (citing *Smart World Techs., LLC v. Juno Online Servs., Inc. (In re Smart World Techs., LLC),* 423 F.3d 166, 176 (2d Cir.2005); *Unsecured Creditors Comm. of Debtor STN Enters., Inc. v. Noyes (In re STN Enters.),* 779 F.2d 901 (2d Cir.1985); *Official Comm. of Unsecured Creditors v. Chinery (In re Cybergenics Corp.),* 330 F.3d 548, 553 (3rd Cir.2003) (*en banc*); *Fogel v. Zell,* 221 F.3d 955, 965 (7th Cir.2000); *Avalanche Mar., Ltd. v. Parekh (In re Parmetex, Inc.),* 199 F.3d 1029, 1031 (9th Cir.1999); *Canadian Pac. Forest Prods. Ltd. v. J.D. Irving, Ltd. (In re Gibson Group, Inc.),* 66 F.3d 1436, 1440–41 (6th Cir.1995); *La. World Exposition v. Fed. Ins. Co.,* 858 F.2d 233, 247–48 (5th Cir. 1988)).

Although the Court does not have enough information to determine whether any of these transfers might be avoidable (or what defenses might apply), the Court notes that this Debtor may have plausible reasons for not pursuing avoidance actions with respect to these transfers. The Debtor has had mostly positive income flow based on its operating reports filed during its bankruptcy, and appears to be a profitable business. Further, there is no evidence the Debtor was insolvent at the time these transfers were made, particularly considering its position that Pinewood does not have a claim against it since it was not a party to the lease between Pinewood and LHSW. (Only two claims have been filed in LHSE's bankruptcy: one by the LHSW Trustee and one by another creditor who claims to be owed approximately $27,000.) Once again, until the Miller County Case is resolved, it cannot be determined whether or not LHSE owes Pinewood at all.

mean all payments made by the debtor in the ordinary course of its business, including payments on settlements, any indemnification obligations, and payments for attorneys for the debtor. That's in the record. He signed the order and we went forward under those terms.

(Transcript, p. 145). No information was provided to the Court regarding which defendants' attorneys fees were paid or how much. Accordingly, the Court has insufficient information concerning this allegation to make any finding; this allegation alone is not enough to show a conflict between Smith and the Debtor.

Smith also explained that he believed the Debtor had to make payments on the LHSW Settlement to keep the business afloat and to keep its Medicaid/Medicare provider number. He testified that in the course of the litigation by the LHSW Trustee against LHSE (among other defendants), he determined that it would be in the best interests of LHSE to settle the Trustee's claims against LHSE related to the transfers from LHSW to LHSE that occurred after LHSW's bankruptcy filing. Smith further explained that he opened the escrow account to put settlement payments there until a final order was entered approving the settlement.

Smith also explained that the ongoing lawsuit in Miller County was an attempt to

lock up LHSE assets and keep it from conducting business, and that during this time, LHSE continued to make payments to the LHSW Trustee to keep the Trustee from executing the inchoate judgment lien against LHSE as she had threatened. Smith stated that if the LHSW Trustee declared a default, LHSE would lose its provider number, and that new numbers are not currently being assigned.[10] According to Smith:

> This is knowledge that I have from management of the company, so I'm not— and is—to perform the services they perform, you have to—and bill and receive payment for those services through—and I'll get my Caids and Cares mixed up—but through the government reimbursement programs, Medicaid, Medicare, third party payors of various kinds, you have to have a provider number, which is assigned, issued, or regulated by various government entities. If a change of ownership—I mean, if an asset sale occurs, if the assets are transferred, then you would lose the provider number. The only way we could transfer the provider number is a sale of the entity. If we sell the entity, it takes subject to all of the claims of creditors of that entity. So it's essentially unsaleable until we get the Renee Williams issue and the Pinewood issues resolved. They are not issuing any more numbers. So if we cease op-

---

**10.** Smith also testified that it had not yet opened a debtor-in-possession ("**DIP**") account although it was instructed to do so by the U.S. Trustee; Smith explained that in a healthcare case, opening a DIP Account presented difficulties due to certain electronic funds requirements. Smith testified that the Debtor would be filing a cash management motion but had not yet done so. Although the Debtor should promptly file such a motion now that Smith and his firm are hired to represent the Debtor, the Court does not find this omission warrants Smith's disqualification, particularly since the U.S. Trustee has not objected.

Likewise, there was some unclear testimony about whether the Debtor had hired a Medicaid reimbursement firm during bankruptcy without court approval; this omission may also be cured by the Debtor and does not warrant disqualification of Smith and his firm.

erations, sell our assets, and I believe—and this is where I'm not sure, I have to just—and I'll—we'll have to do some research—change our—our—change principals—but that's a little more iffy—then we're going to lose that number and we can't operate.

(Transcript, p. 142).

Grundy testified that he always had reservations about making the settlement payments while the settlement was being appealed; he had hoped that LHSE might not owe the payments after all, but trusted Smith to make the right decision. Smith testified that Grundy, as manager of LHSE, ultimately made the decision to authorize the settlement payments. Smith also acknowledged Grundy's hesitation to make the payments:

> Oh, we discussed it at great length, the necessity of making it. If the—if the Trustee for Southwest executes—defaults the settlement agreement and execute [sic] on it, they end up with ownership of Southeast, which is a change of ownership, which would cause Southeast to lost [sic] its—its provider number and be unable to bill for its services. The litigation pending was directed towards trying to destroy Southeast. So the purpose of the thing was to keep the settlement agreement from being defaulted and preserve the—the integrity of the entity, to allow it to continue operating, to attempt to pay its creditors.

(Transcript, p. 92).

Smith explained that LHSE filed this bankruptcy because of an order entered in Miller County that would have "killed off" LHSE. He explained that it was a matter of survival for the company who employed a large number of persons. He believed through bankruptcy, LHSE could honor its Settlement Agreement with the LHSW Trustee (which had not been stayed pending its appeal) and have Pinewood's claim, if it has one against LHSE, adjudicated. Smith's explanation regarding the settlement payments is completely plausible, and the Court finds Smith had valid reasons to counsel LHSE to make such payments, and there is no actual conflict between Smith and Debtor based on these payments.

## CONCLUSION

■ Having reviewed the record in this case and the applicable law, the Court finds that Smith does not actually represent insiders of the Debtor, and that his prepetition representation of the Debtor while certain transfers took place does not create an actual conflict of interest between Smith and the Debtor. Accordingly, the Court finds Smith is both disinterested and does not hold or represent an adverse interest to the Debtor's estate. Further, the Court finds that Smith's representation of the Debtor is in the best interests of the Debtor's estate in that Smith is best equipped to represent the Debtor due to his knowledge of the Debtor, its operations, and the litigation that both preceded and succeeded this bankruptcy case. Additionally, based on the testimony of Grundy and Smith, the Court finds that the Debtor is unlikely to find local counsel willing to represent the Debtor, and that obtaining new effective counsel, particularly at out-of-state rates, will be cost-prohibitive to this estate.[11] Accordingly, there are compelling reasons to

11. On behalf of LHSE, Grundy testified that all other attorneys who have been involved with litigation concerning LHSE or Living Hope Southwest could not represent LHSE in

hire Smith and his law firm as counsel for the Debtor despite the appearance of potential conflicts between the Debtor and certain insiders of the Debtor. The Court concludes that it is the best interests of this estate to hire Smith and his firm to represent the Debtor.

For these reasons, it is hereby

**ORDERED** that the Application to Employ is **APPROVED** as to Jim Smith and Smith Akins, P.A., who are hired as counsel for the Debtor as of June 13, 2012.

**IT IS SO ORDERED.**

its bankruptcy due to conflicts of interest. (Transcript, p. 163, lines: 5–13). Grundy further testified that he had researched finding other counsel for LHSE, and only one local bankruptcy attorney without a conflict could be found but that he refused the case. (Transcript, p. 163–167).